**E-FILED**
Monday, 11 March, 2013  07:01:56 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| VERONICA MARTINEZ | |
| Plaintiff | |
| v. | 13- |
| UHS OF DELAWARE, INC. d/b/a Lincoln Prairie Behavioral Health Care | **JURY DEMAND** |
| Defendant | |

---

## COMPLAINT

Now comes the Plaintiff, Veronica Martinez, by Richard L. Steagall, his attorney, and complaining of the Defendant, UHS of Delaware, Inc., a Corporation d/b/a Lincoln Prairie Behavioral Health Care, for her claims for relief state:

### I.
### Jurisdiction & Venue

1.      Jurisdiction to hear Plaintiff's claims under the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq, is founded under 28 U.S.C. § 1337 (a).

2.      Plaintiff is domiciled in the City of Chatham,  Sangamon County, Illinois. Defendant is corporation that does business that does business in Sangamon County, Illinois, and the occurrences that are the subject of this action occurred in Sangamon County, Illinois. Venue is in the Central District of Illinois under 28 U.S.C. § 1391 (a).

This case is assigned to the Springfield Division of this Court under Local Rule 40:1.

3.      The occurrence that is the subject of this action happened before and on **November 4, 2012** in the City of Springfield, Sangamon County, Illinois.

### III.
### The Parties

4.      Veronica Martinez is 38 years old born in 1974. She has a Bachelor's of Science degree in nursing and is a Registered Nurse in the State of Illinois.  She was employed at the  Lincoln Prairie Behavioral Health Center in Springfield, Illinois  from February 9, 2009 to November 4, 2012 when her employment was terminated.

5.      Defendant, UHS of Delaware, Inc., is a corporation that is a subsidiary of Universal Health Care, Inc., a publically traded holding company that operates through UHS of Delaware, Inc. and other corporate subsidiaries in the business of owning and operating acute care hospitals, behavioral health centers, surgical hospitals, ambulatory surgery centers and radiation oncology centers

6.      As a part of that business, defendant, UHS of Delaware, Inc.,  owned and operated Lincoln Prairie Behavioral Health Center in Springfield, Illinois, an 88 bed hospital offering behavioral health center services for patients in need of those services in an in-patient setting.  UHS of Delaware, Inc ("UHS"). employed Veronica Martinez at the Lincoln Prairie Behavioral Health Center from February 9, 2009 through November 4, 2012 when her employment was terminated.

### III.
### The Incidents

7.  The Lincoln Center is an in-patient psychiatric hospital providing care for mentally disturbed pediatric and adolescent patients.

8.  Martinez began her employment on February 9, 2009 as a Registered Nurse in a Floor Nurse capacity on the part time day shift at the Lincoln Center. During this time, Martinez was also working on completion of her Bachelor's degree in Nursing which she successfully obtained in May, 2010.

9.  Martinez was promoted to a full time position at the Lincoln Center as Building Supervisor in April or May, 2010. As Building Supervisor, Martinez was the person in charge of the Center 12 hour days on weekends and holidays with oversight over the nurses and was involved problems with patients that arose. She also performed similar duties two eight hour days during the week.

10.  In June, 2012, Martinez was promoted to Clinical Nurse Manager working 10 hour days on the day shift, five days a week at the Center. Martinez managed a total of 12 employees, four Registered Nurses ("RN"), three Licensed Practical Nurse (LPN), and five Behavioral Health Technicians (BHT).  Martinez reported to the Chief Nursing Officer. In her absence, Martinez had responsibility for clinical decision making such as calling extra staff when patient occupancy required it, reviewing criteria of new admissions to confirm eligibility for admission as private pay or a Medicaid patient, and overall supervision of the nursing services provided.

3

11.     Martinez's original treating psychiatrist - Juan Medinah, M.D. – has diagnosed her as suffering from bi-polar disorder. There are two degrees of bi-polar disorder, Bi-Polar I which is the lesser and can be treated, and Bi-Polar II, the more severe which is difficult to treat and manage. Dr. Rodica Brisan whose treatment of Martinez is described below diagnosed Martinez as suffering from border-line personality disorder with major depression and chronic anxiety. The distinction between major depression and chronic anxiety and Bi-Polar I disorder is a matter of classification by the psychiatrist by the degree of symptoms.

12.      Dr. Medinah, who does not perform electroconvulsive therapy, referred Martinez to Rodica Brisan, M.D, who did perform electroconvulsive therapy. Martinez had three sessions of electroconvulsive therapy for her diagnosed mental disorders in February, 2012. After the electroconvulsive therapy, Martinez did follow up treatment with Dr. Brisan through September, 2012 when she then returned for treatment by Dr. Medinah. She attempted to go medication free after the ECT therapy, but was placed on Lexipro and .5 mg of Atavan.

13.     Martinez obtained Family and Medical Leave Act leave from Lincoln Center for five weeks for the electroconvulsive treatment in February-March, 2012. In electroconvulsive therapy, the patient is placed under general anesthesia and restrained; electrical currents are administered which causes a brain seizure which has been medically demonstrated to reverse the effects of depression on patient.

14.     Martinez recovered from the procedure and her depression symptoms

4

were sufficiently under control that she could return to work. She was released to return to work in March, 2012 and was adequately performing her employment duties.

15.     Lincoln Center received medical reports of Martinez condition as a part of the process of granting the Family and Medical Leave Act leave. It also received medical reports that her condition allowed her to return to work in order for Lincoln Center to be assured Martinez was capable of doing the essential functions of her employment as Clinical Nurse Manager.

16.     Martinez's Bi-Polar Disorder I diagnosed by Dr. Medinah or border-line personality disorder with major depression and chronic anxiety diagnosed by Dr. Brisan required three sessions of electronculsive shock treatment and substantially limited the major life activities of sleeping, communicating, concentrating, and interacting with people.

17.     Martinez was capable of performing the essential functions of the Clinical Nurse Manager position had during her 8-10 hour shifts when she returned to work in March, 2012 and the time she was on call 24 hours if the Supervisors at Lincoln Center were adequately performing their employment duties.

18.     In June, 2012, Martinez experienced elevated levels of anxiety and insomnia, which she reported to her treating psychiatrist Dr. Brisan for the electroconvulsive therapy.  Martinez also informed her employment supervisor, Renae Hale, Chief Officer of Lincoln Center, of her elevated anxiety and insomnia and that she required assistance in Martinez' Clinical Nursing Officer duties. Hale responded that

5

she and Barb Smith, the other Clinical Nursing Officer stated they would do what they could to help ease Martinez's work load.

19.     Martinez worked at the Lincoln Center, which is a psychiatric hospital. Renae Hale, Chief Officer of Lincoln Center is psychiatric nurse with expert knowledge of psychiatric conditions, treatment, and accommodations beyond the ken of the average layperson. She knew Martinez had been diagnosed with depression and anxiety or Bi-Polar I disorder and had reached such a level that it required treatment by electroconvulsive therapy. While Martinez was able to return to work and perform the essential functions of her employment, Hale knew the extra time Martinezwas being required to devote to the 24 hour on call duties of the position could cause a relapse of her depression and anxiety symptoms.

20.     Hale and Smith did not assist Martinez in reducing the work load as Clinical Nursing Officer. The Clinical Nursing Officers are on call at various 24 hour intervals 2-3 times a week including weekends.  Shelly Scott, House Supervisor of the building, was not adequately performing her duties. Scott had told Martinez, Barb Smith, and Renae Hale that she was a recovering heroin addict. Scott had been seen by Lincoln Center employees in the evening in the parking lot with a syringe in her hand. Lincoln Center tested Scott two days later for the presence of heroin; the results were negative.

21.     Scott had memory problems, would break out crying, and was losing a significant amount of weight, which raised a reasonable suspicion of a relapse into

heroin use apparent to those trained in the treatment of psychiatric disorders. Lincoln Center treated psychiatric disorders; its nurse were trained in that treatment. Scott's mental difficulties required Martinez to spend extensive time in her 24 hour supervision periods that would had not been required had Scott not had these mental difficulties.

22.     Martinez had informed Renae Hale of Shelly Scott's performance and symptoms and its effect of requiring substantial additional time from Martinez in her 24 call periods and its effect on Martinez of increasing her anxiety and depression symptoms in June, 2012.  Scott's questionable behavior was also exhibited in the presence of Hale whose psychiatric nursing training should have alerted Hale to the possibility of a relapse.

23.     Scott's employment performance inadequacies – whether due to relapse into heroin use, her efforts to avoid a relapse, or conduct unrelated to any substance abuse –required a large amount of additional time to be expended by Martinez when she was out of the Lincoln Center facility on call.  Martinez had to respond to nearly every call from Shelly Scott by going personally to the Lincoln Center facility to address the problem and calm Scott down.

24.     Hale, Chief Nursing Officer, had overall supervision of Clinical Nursing Officers Martinez and Barbara Hale and Shelley Scott House Supervisor, did not respond to the failure of Scott to adequately perform her duties with discipline and additional training. Martinez also orally told  Mark Litrell, Lincoln Center Chief Executive Officer, of Shelly Scott's employment performance problems,  her history of

7

heroin addiction, and possible relapse. Littrell also did not respond to Scott's employment performance deficiencies.

25.     Lincoln Center encourages its management employees to pursue additional educational opportunities reimbursing the employee for the tuition incurred by the employing in additional education. On September 9, 2012, Martinez enrolled in an accredited online Master in Nursing course program through Chamberlain College of Addison, Illinois and St. Louis, Missouri. Her schedule is one class of three hours credit for every eight weeks.

26.     By the end of September, 2012, the difficulties with Scott when Martinez was Clinical Nursing Officer assigned on call for 24 hours were such that Martinez's insomnia increased to where she was not sleeping except for a few hours and her anxiety levels increased which lead her psychiatrist, Dr. Medinah, to increase the dosage of the Atavan from .5 mg Martinez began taking after the ECT therapy to 1.0 mg.

27.     Martinez told her supervisor Renae Hale in late September, 2012  of the changes to her physical and mental condition set forth in ¶ 26 and requested to leave the Clinical Nursing Officer position and take an Educator or floor Nurse position, each of which were open when Martinez asked Hale for reassignment. Hale refused stating there was no one available to take Martinez's place as Clinical Nursing Officer.

28.     The medical records of Martinez were available to Hale – who is a psychiatric nurse -- but Hale never asked for any records documenting Martinez's

condition. Lincoln Center had the medical reports of her FMLA leave in February and March, 2012 confirming Martinez's diagnosed psychiatric condition.

29.     After Hale refused reassignment, Martinez in September, 2012 also told told Mark Littrell, the Lincoln Center Chief Executive Officer, of her declining mental and physical condition. Littrell also had available to him Martinez's medical reports of her psychiatric condition when she took her FMLA leave in February-March, 2012. Littrell also refused Martinez's requested reassignment.

30.     Martinez continued to perform her duties as Clinical Nurse Manager at Lincoln Center. Scott's employment performance did not improve and declined further, which resulted in more calls from Scott to Martinez and more personal trips by Martinez to the Lincoln Center facility.

31.     Martinez continued to suffered the severe difficulty with  insomnia and anxiety continued through October, 2012.  Due to severe insomnia and her worsening mental and physical condition, Martinez reported for work 30 minutes-60 minutes late on the mornings of October 29 & 30, 2012.  She would work later in the afternoon to put in her full day of work.

32.     On October 29, 2012, Martinez met Chief Nursing Officer Renae Hale in Hale's office. Martinez told Hale the insomnia and anxiety had not improved since June, 2012 and likely worsened since her medication dosage was increased in late September, 2012. The Chief Nursing Office duties were overwhelming and she needed to be transferred the Education position at Lincoln Center which was open.  The

medical records of Martinez's condition since September, 2012 were available, but Hale was a psychiatric nurse well aware of the insomnia and anxiety conditions Martinez was experiencing. If documentation were required, Hale certainly knew how to obtain it.

33.     Hale responded on October 29, 2012 that she would support Martinez in any way possible, she was an asset, and that she had big plans for Martinez after she graduated with her Masters.

34.     Martinez sent a text to Hale on October 30, 2012 asking if she had thought any more about the Educator position. Hale responded she did not have time to think about it.

35.     On October 31, 2012, Martinez worked the full day and went home taking her Atavan and Nyquil over the counter because she had chills. She awakened at 5:00 a.m. on November 1, 2012 still feeling poorly. Lincoln Center's sick day policy was for Clinical Nurse Managers to telephone in at 5:00 a.m. to inform they were sick and taking the day off.  The Chief Nursing Manager then assists in overseeing the floor nurse's work in the absence of the sick Clinical Nurse Manager. Martinez followed that policy taking the sick day on November 1, 2012.

36.     The sick day policy of Lincoln was that employees were allowed three sick days per six month period.  On October 1, 2012, Martinez's prior sick days expired, and she was allowed the additional three days for the next six month period under the Lincoln Center.  Her November 1, 2012 sick day was the first of the three sick days she

was allowed under the Lincoln Center sick day policy.

37.     Martinez went back to sleep at home. Hale sent a text message to Martinez later the morning of November 1, 2012 stating Martinez's behavior was worrisome and questioned her priorities.  Martinez responded by text asking why Hale was attacking Martinez's work habits when she (Martinez) worked longer and harder than Hale and what is worrisome is her classes because education is her priority.

38.     Hale responded by text on Martinez's sick day that Martinez was to meet her in the office on Friday, November 2, 2012.

39.     Martinez returned to work on Friday, November 2, 2012 at 8:00 a.m. reporting to Hale's office. Hale and Tammi Ireland, Director of Human Resources, were present. They informed Martinez that she was suspended effective immediately without pay and told to leave the Lincoln Center and report back on Monday, November 5, 2012.  Martinez left the office on November 2, 2012 and Lincoln Center as instructed.

40.     Martinez reported to work on Monday, November 5, 2012 to Hale's office as instructed. Hale was again in the office with Tammi Ireland, Director of Human Resources. Hale and Ireland told Martinez that her employment at the Lincoln Center was terminated for insubordination.

41.     Hale and Ireland gave Martinez a document titled "Employee Corrective Action Report" which stated Martinez was insubordinate and unprofessional when Hale requested information about an arrangement set up for 11/1/12. The writing does

11

not indicate the "arrangement" was a sick day.  "Veronica stated "education was a priority" and that Hale was "not to comment on her (Martinez's) dedication and priorities."  The document stated Veronica was released of her duties as CNM effective immediately.

42.    The "Employee Corrective Action Report" document concluded with the following  false statement,

"Veronica had requested to "step down" two weeks ago and was asked to stay on until a replacement was found."

What Veronica had requested on October 29, 2012 was a transfer from the Clinical Nursing Manager position to the open position of Education due to her mental condition of insomnia and anxiety. She had made the same request in late September, 2012 and was refused.

## IV.
## Plaintiff's Claims

### A.    Federal Statute Involved

43.    At all times material, there was in full force and effect in the United States, a certain statute, the Americans With Disabilities Act, 42 U.S.C. § 12102 et seq, which provided:

**Americans With Disabilities Act, 42 U.S.C. § 12102, 12111-12112, 12203 , 12205**

**§ 12102. Definition of disability**

As used in this chapter:

(1) Disability The term "disability" means, with respect to an individual--

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major life activities

(A) In general

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

(4) Rules of construction regarding the definition of disability

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

13

(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(E)(I) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as--

(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

(II) use of assistive technology;

(III) reasonable accommodations or auxiliary aids or services; or

(IV) learned behavioral or adaptive neurological modifications.

(ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(iii) As used in this subparagraph--

(I) the term "ordinary eyeglasses or contact lenses" means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

(II) the term "low-vision devices" means devices that magnify, enhance, or otherwise augment a visual image.

## § 12111. Definitions

14

As used in this subchapter:

(8) Qualified individual

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9) Reasonable accommodation

These provisions of the Americans With Disabilities Act are incorporated as the standard for the Rehabilitation Act. 29 U.S.C. § 794 (d).

The term "reasonable accommodation" may include--

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

(10) Undue hardship

(A) In general

The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

(B) Factors to be considered

In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include--

(I) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

## § 12112. Discrimination

(a) General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b) Construction

As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes--

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

(3) utilizing standards, criteria, or methods of administration--

16

(A) that have the effect of discrimination on the basis of disability; or

(B) that perpetuate the discrimination of others who are subject to common administrative control;

(4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

## § 12203. Prohibition against retaliation and coercion

(a) Retaliation

No person shall discriminate against any individual because such individual has

opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

(b) Interference, coercion, or intimidation

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

(c) Remedies and procedures

The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively.

**B.    Plaintiff's Claims**

44.    Martinez was a qualified individual with a disability namely personality disorder with depression and anxiety or Bi-Polar I disorder substantially limited the major life activities of sleeping, communicating, concentrating, and interacting with people. 42 U.S.C. §§ 12102 (1); 12111 (8), (9).

45.    The Lincoln Center acting through its managerial agents discriminated against Martinez in violation of the Americans With Disabilities Act in the following manner:

    A.    In June, 2012, when Martinez reported increasing anxiety and insomnia and Chief Nursing Officer Renae Hale offered that she and Barb Smith would assist Martinez with her 24 hour call periods accommodate Martinez's disability as required by 42 U.S.C. § 12112 (a), (b)(5)(A), (B), but did not provide the promised assistance and did nothing to remedy the non-performance of duties by House

18

Supervisor Shelley Scott which required an undue amount of time to be expended by Martinez on her 24 hour call periods as alleged in ¶ 21 & 22.

B.   In September, 2012, Hale was informed by Martinez of the continued increase in her anxiety and insomnia requiring an increase in the Atavan Martinez was taking from .5 mg to 1.0 mg and that due to this increase in her symptoms, Martinez required a transfer from the Clinical Nurse position to the Educator or floor nurse positions which were open and for which Martinez was qualified, but Hale refused.

C.   Martinez told Mark Littrell of the increase in her symptoms in September, 2012 and had previously told Litrell of the problems with Shelley Scott requiring her to expend extraordinary amounts of time while on 24 hour call. Martinez asked Litrell for transfer to the Educator position or the floor nurse position which were open and for which Martinez was qualified, but Litrell refused.

D.   Martinez again told Chief Nursing Officer Renae Hale on October 29, 2012 of the continuing increase in insomnia and anxiety, that the Chief Nursing Officer duties were intolerable to Martinez, and asked for a transfer to the Educator position, which remained open, but Hale refused saying Martinez was an asset, she would support her in any way possible, and she had big plans for Martinez.

E.   Hale's placement of Martinez on suspension on November 2, 2012 and then terminating her employment on November 5, 2012 for the false charge of insubordination for Martinez's statement by text while on sick leave on November 1, 2012 when Hale contacted Martinez asking why Hale was attacking Martinez's work habits when she (Martinez) worked longer and harder than Hale and what is worrisome is her classes because education is her priority.

### V.
### Relief Sought

46.   As a direct and proximate result of the disability discrimination a alleged above, Martinez has lost income in the past and will lose income in the future from the lesser income she earns at her present employment in the total amount of $34,038.88

19

from her November 5, 2012 termination until she found employment at a Decatur, Illinois psychiatric facility and will incur $49,805.60 in commuting costs from her Chatham, Illinois residence to her present employment in Decatur, Illinois that she would not have incurred had she been working in Springfield and further has endured physical pain and suffering with mental anguish.

47.     UHS of Delaware, Inc. employs more than 500 persons subjecting it to the limit of $300,000 in pain and suffering damages. 42 U.S.C. § 12117 (a) incorporating remedies and procedures of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 (g)(1)  42 U.S.C.A. § 1981a (a)(2), (b)(3)(C).

48.     Martinez has in the past and will in the future incur attorney's fees and expenses in prosecuting this action for which she is entitled to recovery under the Americans With Disabilities Act.  42 U.S.C. § 12117 (a) incorporating remedies and procedures of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 (k) .

## VI.
### Satisfaction of Conditions of Bringing Action

49.     Martinez filed a Charge of Discrimination on or about November 24, 2012 with the Illinois Department of Human Rights which Equal Employment Opportunity Commission which was also filed with the under the work sharing agreement between those agencies. The filing was within the 180 day time limit for filing such charges with the Illinois Department of Human Rights and was within the 300 day time limit for filing Charges with the Equal Employment Opportunity Commission applicable to

claims occurring in the State of Illinois which has an agency addressing discrimination, the Illinois Department of Human Rights.  42 U.S.C. § 12117 (a) incorporating remedies and procedures of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 (e)(1).

50.     The Equal Employment Opportunity Commission issued and mailed a Notice of Right to Sue on December 11, 2012 which was received after that date of mailing by Martinez. This action is being filed on March 11, 2013, which is within the 90 day period for filing such actions after receipt of the Notice of Right to Sue .42 U.S.C. § 12117 (a) 42 U.S.C. § 2000e-5 (f)(1).

## VII.
## Prayer for Relief

**WHEREFORE,** Plaintiff, Veronica Martinez , prays for judgment in her favor and against the Defendant, UHS OF DELAWARE, INC. d/b/a Lincoln Prairie Behavioral Health Care, in the following:

1.     An award of compensatory damages in the amount of THREE HUNDRED SEVENTY FOUR THOUSAND THREE FIFTY SIX DOLLARS ($374,356)

2.     An injunction reinstating plaintiff to employment at defendant's Lincoln Prairie Behavioral Health Care as a floor nurse or Educator or similar position for which she is qualified.

3.     An award as a part of costs of the amount of attorney's fees and expenses incurred in prosecuting this action under . 42 U.S.C. § 12117 (a) incorporating 42 U.S.C. § 2000e-5 (k).

## PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully submitted,


s/ Richard L. Steagall
RICHARD L. STEAGALL
Attorney for the Plaintiff


RICHARD L. STEAGALL
RYAN S. McCRACKEN
Nicoara & Steagall
416 Main Street, Suite 815
Commerce Building
Peoria, IL 61602-1115
309-674-6085
Fax: 309-674-6032
nicsteag@mtco.com