IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| VERONICA MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 13-3070 |
| | ) | |
| UHS OF DELAWARE, INC. and/or | ) | |
| SPRINGFIELD HOSPITAL, INC., | ) | |
| d/b/a Lincoln Prairie Behavioral | ) | |
| Health Care, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

RICHARD MILLS, U.S. District Judge:

Veronica Martinez brings this action against her former employer asserting failure to accommodate and unlawful termination claims pursuant to the Americans with Disabilities Act of 2008 ("ADA").

Pending is the Motion of Defendant Springfield Hospital, Inc. d/b/a/ Lincoln Prairie Behavioral Health Center (the "Defendant" or "Lincoln Prairie") for Summary Judgment.

At the end of the day, the motion is allowed.

But first, let us review the facts.

# I. FACTUAL BACKGROUND

Veronica Martinez was employed as a Clinical Nurse Manager for Lincoln Prairie when she was terminated in November of 2012.  The Plaintiff has been diagnosed with and treated for depression and bipolar disorder.

Lincoln Prairie is an inpatient (residential) psychiatric hospital for pediatric and adolescent patients.  Its philosophy is to promote healing of children and families through compassionate and supportive care by providing a safe, nurturing and comfortable environment.

## A. Lincoln Prairie

Lincoln Prairie is a "lockdown" secured facility.  The pediatric and adolescent patients are not free to leave the facility and are wholly dependent on staff members to care for them and to provide for their physical and emotional needs.  Patients are involuntarily admitted to the facility because they are at risk of harm to themselves, to others, or their parents cannot care for them due to the severity of their acute mental health conditions.

The primary responsibility of the nursing staff is the day to day care and safety of the patients.  The risk of physical aggression from patients is a daily occurrence.  In 2012, patients would bite, scratch, kick, throw things, attack staff, attack each other and self-injure.  The Plaintiff herself has personally experienced this behavior.  On one occasion, the Plaintiff was attacked by a patient and had her hair pulled, kicked and punched.  The Plaintiff was attacked, put in a hold, fell to the ground and hit her head on the floor.  A patient bit the Plaintiff while conducting physical restraint.  A patient dug his nails and scratched the Plaintiff.

To address these risks, the facility staffs each unit with a sufficient number of adequately trained and experienced personnel.  Based on the acuity of the unit, there should be at least 1-2 registered nurses per floor.  The facility was generally slower during the summer months and would get busier (increased patient population) in September, which was the beginning of the school year.  If a unit is left understaffed, there is a significant safety risk of physical harm to the residents and staff members.

The Plaintiff disputes that the facility was always adequately staffed.

3

The condition of the patient population varied, which would affect the number of necessary staff.  The Plaintiff claims she always worked at least two hours after her shift was scheduled to end.  Additionally, she and other employees were on call after hours and on weekends.

To ensure compliance with various state and federal regulations, Lincoln Prairie would be subject to internal compliance site inspections. The Plaintiff knew and understood that a corporate visit was an intense and critical time at the facility.

In 2012, the Plaintiff was a clinical nurse manager of the pediatric unit.  The clinical nurse manager is the most senior "hands on" person on the unit responsible for the management of patient care and is the role model and leader to staff.  The nurse manager oversees the unit, the staff nurses and documentation.

The Defendant alleges that the pediatric unit that Plaintiff was assigned to is one of the more acute units at the facility.  The Plaintiff purports to dispute the assertion, claiming there could be an aggressive patient on any floor.

In 2012, Renae Hale was the Chief Nursing Officer and Plaintiff's direct manager. The Chief Executive Officer ("CEO") was Mark Littrell and Tami Ireland was the human resource director.

B. Lincoln Prairie's policies[1]

The Plaintiff was an employee-at-will for Lincoln Prairie and could be terminated at any time for any reason with or without notice. The facility did not require the implementation of any disciplinary plan prior to termination. The Plaintiff disputes this to the extent that the facility had a progressive discipline plan which was not followed in her case. The Defendant notes that company policy provides that based on the severity of the situation, disciplinary steps may be eliminated and/or it may be appropriate to immediately terminate the employee.

The Plaintiff received and acknowledged Lincoln Prairie's Employee Handbook, Attendance, Human Resource and Code of Conduct Policy and agreed to abide by it. The facility has policies that relate to the behavior of

_____

[1]The Plaintiff purports to dispute a number of assertions without adequate support from the record. At times, she also adds facts which do not directly contest the facts alleged. The Court notes any allegations that are properly disputed.

employees.   The Plaintiff acknowledged these rules, which included the

following:

> Certain rules and regulations regarding employee behavior are
> necessary for the efficient operation of the Facility and for the
> benefit and protection of the rights and safety of all.  Conduct
> that interferes with Facility operations, brings discredit to the
> Facility, or is offensive to patients or fellow employees will not
> be tolerated. . . . [including but not limited to]
>
> • Non-compliance with any established Facility policy or work
>   rules.
> • Insubordination, including refusal to do assigned work or
>   refusal to perform work in the manner described by a supervisor
>   without proper justification.
> • Inattention to duties or unsatisfactory job performance.
> • Violation of any Facility safety and health rules or standards.

Lincoln Prairie employees are required to exercise appropriate

judgment and conduct themselves in a manner that reflects use of common

sense and good judgment, including (1) a total commitment to providing

the highest quality of care through personal effort; (2) carrying out the

written policies and procedures designed to enhance the dignity of patients;

(3) avoidance of conflicting outside activities; (4) contribute to a supportive

work environment by working to maintain a positive attitude; and (5)

conduct relationships between staff that is characterized by mutual respect.

Lincoln Prairie made clear to its employees that disciplinary action could result from: (a) inadequate or incompetent job performance; (b) failing to follow the directives of management; (c) abusive or improper treatment of patients or other employees; (d) violation of the attendance policy; or (e) failure to follow the code of conduct and ethical standards.

Lincoln Prairie relies on punctual attendance in order to provide quality patient care.  The Plaintiff was expected to be at the facility at 7:00 a.m. on her scheduled shift.  The Defendant alleges that, if she was not coming in, she was supposed to call-in by 5:00 a.m., two hours before the start of her shift.  As a supervisor, the Plaintiff disputes she was subject to the call-in policy, though she says she adhered to it.

Lincoln Prairie has a written policy setting forth that it complies with the ADA and it provides equal employment to individuals with physical or mental handicaps and will, upon request and evaluating of the facts and circumstances, make reasonable accommodations to otherwise qualified individuals.

C. Plaintiff's mental health and FMLA leave

The Plaintiff did not tell Lincoln Prairie about her mental health illness when she was hired in 2009.  The Plaintiff states that the ADA prohibits pre-employment inquires about disabilities and she was not asked on the employment application about mental health illness.

In 2012, the Plaintiff voluntarily elected to stop taking her mental health medication and undergo electroconvulsive therapy ("ECT") because she wanted to try and get pregnant.  In connection with the treatment, the Plaintiff applied for (and was granted) leave under the Family Medical Leave Act ("FMLA Leave") in January of 2012. The Plaintiff's physician noted the FMLA leave was necessary for the Plaintiff's "major depressive disorder, recurrent without psychosis [and] generalized anxiety disorder." The paperwork did not inform Lincoln Prairie that she had bipolar disorder, for which she was diagnosed in 2007.  The Plaintiff did not submit other medical information or any medical records in support of her request for leave.

Lincoln Prairie granted the Plaintiff's request for FMLA leave.  The Plaintiff began ECT treatment in February of 2012 but then voluntarily

8

withdrew from treatment and returned to work.  The Plaintiff did not like the treatment and decided to return to her medication.  The Plaintiff stated that the ECT treatment was not geared toward her needs and did not benefit her and her last ECT treatment did not go well.

When the Plaintiff returned to work from FMLA leave, she was placed in her same job position and her same pay.  According to the Defendant, the Plaintiff did not request any accommodations upon return and returned without any restrictions.  The Plaintiff was able to adequately perform her duties upon her return.   The Plaintiff was able to return to work, communicate with patients and staff, and drive her vehicle.  The Plaintiff disputes the allegation that she did not request an accommodation.  In June of 2012, the Plaintiff claims she had discussions with her supervisor, Renae Hale,  about stepping down from her Clinical Nurse Manager position due to stress and moving to another position.  In August and September of 2012, the Plaintiff alleges she had further discussions with Hale and reiterated she could no longer handle the demands of the position.  The Plaintiff was told that a floor nurse position was available in one of the

units.  However, she would have to wait until someone was hired to fill her position.

Mark Littrell did not know that the Plaintiff was bipolar.  The Defendant alleges that Renae Hale did not know either.  Hale knew that Plaintiff took FMLA leave to seek ECT but did not know why.  The Plaintiff claims that, although Hale testified she did not know the Plaintiff was bipolar, this is disputed because Hale knew the Plaintiff was having behavioral problems.  Because of Hale's training and knowledge of ECT, the Plaintiff alleges she would have known about the extent of the Plaintiff's mental health problems.

D. Request for job modification and reasonable accommodations

In the Summer of 2012, the Plaintiff made complaints about another employee not performing adequately and the impact it was having on the Plaintiff's workload.  The facility investigated this report and provided counseling to this employee and the Plaintiff.

In June of 2012, the Plaintiff elected to return to school part-time and pursue her Master's degree.  The Plaintiff's five-year old daughter and

teenage son were living with her at the time.  When the Plaintiff initially enrolled in school, it was her intention to stay in the clinical nurse manager position, take online classes and study in the evenings.  The Plaintiff disputes the assertion only to the extent that she talked to Renae Hale in June of 2012 about potentially moving to another position.  Lincoln Prairie supported the Plaintiff's pursuit of further education and even provided the Plaintiff with tuition reimbursement.

In the late Summer/early Fall time frame of 2012, the Plaintiff complained to Littrell she felt overworked and underpaid compared to other clinical nurse managers.  The Plaintiff stated she was not going to continue working as hard unless she made more money.  Littrell offered her more money and the Plaintiff agreed to stay on in the position of clinical nurse manager.  Littrell gave her a 3% raise on October 5, 2012 and was told to expect two more raises over the next six months.  The Plaintiff did not mention her bipolar condition or any disability during this conversation. The Plaintiff further notes that Littrell and Hale had approved her transfer to a floor nurse position when a successor was found for her position.

The Defendant asserts that later in the Fall of 2012, the Plaintiff asked to step down from the clinical nurse manager position entirely because of her school, her life duties and the position was stressful. The Plaintiff did not mention her bipolar condition or any mental health condition as being the reason she wanted to step down. The Plaintiff reiterates that Renae Hale knew she had ETC, which is used to treat individuals with severe depression. Hale responded that the facility would accommodate her request because they thought the Plaintiff was a good nurse and she was an asset to the facility. The facility never told the Plaintiff they would not try to accommodate her request to step down.

The Plaintiff was asked to stay on until they could find a replacement for her. She agreed to stay on as the clinical nurse manager until a replacement could be found. The clinical nurse manager is an important position at the facility and it had to be filled before the Plaintiff could be moved. Lincoln Prairie did discuss with the Plaintiff other positions that she could be transferred into, such as a nurse educator or floor nurse. The Plaintiff contends that, although her transfer was approved, she was

terminated before she could take the position.

Renae Hale spoke to other employees that might be able to fill the Plaintiff's position.  Specifically, Hale contemplated and discussed: (1) moving Adam Cooper from the floor nurse to the charge nurse position on the fourth floor; (2) moving Barb Smith from the fourth floor charge position to the Plaintiff's position; (3) temporarily moving the Plaintiff to the floor nurse position on the fourth floor.  Hale then began evaluating the scope and development of the nurse educator position, which was not currently available but something the facility had in the past.  Although the position had been vacant for two years, Hale contemplated re-establishing it for the Plaintiff.  The Plaintiff reiterates that her transfer to a floor nurse position had been approved upon the naming of a replacement for clinical nurse manager position.

On October 25, 2012, Tami Ireland sent Hale the job description for the Plaintiff's clinical nurse manager position so that the position could be posted and filled–in order to accommodate the Plaintiff's request to step down.  The same day, Ireland sent Hale a former job description for the

nurse educator position so that the needs of the facility could be evaluated and the position responsibilities could be identified, finalized and posted as a possible alternative position for the Plaintiff.

The Plaintiff was encouraged to apply for the nurse educator position. On October 26, 2012, the Plaintiff submitted a job bid for the nurse educator position that was accepted by Hale.

On October 29, 2012, Hale and Ireland had an email exchange regarding posting the finalized nurse educator position. Hale then charted out a tentative restructuring schedule to fill the Plaintiff's role as a clinical nurse manager, which would then open a floor nurse position and/or floor nurse position for the Plaintiff and discussed this with Linda Simko, the corporate representative.

E. Events leading to termination

The Defendant alleges that, in the days leading up to her termination, the Plaintiff knew that the facility was undergoing an important site inspection from a corporate representative, Linda Simko. The Plaintiff asserts that the inspection of her floor was completed on October 31, 2012.

She had helped prepare for the inspection. The Plaintiff spent most of that day with Simko. Simko's last day at the facility was November 1, 2012, when the Plaintiff was home sick.

The Defendant alleges that, before November 1, 2012, the Plaintiff knew that Hale was going to be unavailable that day because she was scheduled to be with Simko and it was important for the Plaintiff to be present on the floor of her unit. One of the other floor nurses (Jovetta Brown) had been given the day off because the Plaintiff had promised that she would be available to cover the floor of her unit. The Plaintiff disputes this assertion and states she does not recall talking to Hale about Jovetta Brown taking the day off.

The Defendant alleges that Plaintiff's shift on November 1, 2012 was scheduled to begin at 7:00 a.m. On that date, the Plaintiff contacted the facility by sending a text message at 7:13 a.m., stating she was running late. The Plaintiff did not say she was sick. The Plaintiff states the text message was not the first message. She testified she had called Debra Buck and told her she would not be at work. After reviewing her phone records, however,

the Plaintiff later conceded the earlier call did not occur and her first contact with the facility was not until the 7:13 a.m. text message.  The Plaintiff states she had cold and flu-like symptoms and was exhausted.  The Plaintiff also sent a text message to Hale at 7:20 a.m., stating she was tired, she woke up late and would be in as soon as possible.  The Plaintiff admits sending the text message but says she was groggy.

One hour later, Hale followed up with the Plaintiff to see if she was in yet.  In response, the Plaintiff said not yet and admitted she was up late the night before doing homework.  The Plaintiff mentioned she might be getting a cold but told Hale she would be in at 11:00 a.m.  The Plaintiff states she was groggy and had an exhausting day the day before.  Hale asked the Plaintiff to come in sooner because there was a medical need that had to be addressed with a new patient.  The Defendant alleges that when Hale questioned the Plaintiff's attendance, the Plaintiff was rude, unprofessional and unapologetic.  At 9:51 a.m., Hale sent the following text message to the Plaintiff, "We gave Jovetta day off and you said you would [be] here to help . . . this is worrisome that this was not a priority for you."

16

At 10:06 and 10:07 a.m., the Plaintiff responded as follows:

> What's worrisome is my classes at this point.  The whole reason I stepped down was because my education is my priority.  I'm not going to pretend I'm not offended.  I have often wondered why you showed the same, not shown something to be a "priority."  Like now.  The audacity you have is beyond me.  I work hard, and to be honest, harder than you do at times.  So please don't dare comment on my dedication and priorities.  All would find your comment asinine.

> And don't text me again today.  If you want to speak to me, do so face to face.

According to the Defendant, the Plaintiff then called into the facility claiming she was not coming in because she was sick.  This was approximately five and a half hours after the start of her shift.  Until then, Hale expected the Plaintiff to come in to work.  At 12:33 p.m., Hale sent the following text message to the Plaintiff: Please meet me tomorrow morning at 8am in my office. . . I have every right to comment on your actions . . . this was an important week having Linda here."  The Plaintiff denies that she was rude and unprofessional, though she admitted her behavior could be described that way.  She had cold and flu symptoms, was groggy and had an exhausting previous day.  She had been dealing with

17

stress.  The Plaintiff admits the text messages quoted above are accurate. The Plaintiff's text messages do not mention anxiety, depression, stress, bipolar or her mental health as being the reason she was running late or eventually not coming in at all.

### F. Decision to terminate the Plaintiff

On November 2, 2012, the Plaintiff was temporarily suspended while the facility investigated what occurred on November 1.  Mark Littrell testified that upon meeting with Tami Ireland and Renae Hale on November 2, 2012, it was decided that termination would occur.

On November 5, 2012, the Plaintiff then had a meeting with Ireland and Hale and acknowledged her behavior on November 1 had been unprofessional, insolent and that she had acted beneath her status.  The Plaintiff did not claim she was having issues with her mental health or bipolar nor did she attribute her conduct on the day to mental health conditions.

Lincoln Prairie concluded the Plaintiff's actions were especially egregious because she left her unit unattended with the understanding of

low staffing, which created a potential safety issue, coupled with the blatant disrespectful and insubordinate behavior to her current supervisor. The Defendant decided to terminate the Plaintiff, citing the following reasons: (1) her actions constituted a total disregard for the safety of the facility by putting patients and staff at risk; (2) the Plaintiff demonstrated insubordination and unprofessional conduct; (3) the Plaintiff violated the attendance policy; and (4) her behavior was generally at odds with the company's cultures. The Plaintiff generally denies the Defendant's assertions and states that clinical nurse managers are not essential to patient care.

Lincoln Prairie states that Plaintiff was not terminated due to her bipolar condition. The Plaintiff's bipolar condition and mental health were not raised by the Plaintiff or discussed during the meeting. The Plaintiff reiterates that Renae Hale knew the Plaintiff was having behavioral problems and had gone through ETC. Moreover, the Plaintiff's previous diagnoses were available in the records.

The Plaintiff was terminated from her position at Springfield Clinic

in October of 2008 for insubordination.  The Plaintiff also had work performance issues at St. John's Hospital.  She was written up because of her behavior and work performance.  When her employment ended at St. John's, it was noted that the quality of her work, her relationship with others and her communication with others needed improvement and she was not eligible for re-employment.  The Plaintiff started working at Heritage Behavioral in December of 2012 and was terminated less than three months later, in February of 2013.  The Plaintiff has received verbal counseling from her current employer, McFarland Hospital.[2]

The Plaintiff's Second Amended Complaint asserts claims pursuant to the ADA.  The Plaintiff alleges that the termination of her employment constituted a failure to accommodate her disability of depression, anxiety disorder and bipolar 1 disorder, the symptoms of which were evident in the November 1, 2012 text message exchange with Renae Hale.  Alternatively,

---

[2]The Plaintiff alleges her work history and/or experience is immaterial. Based on her allegation of wrongful termination by Lincoln Prairie in violation of the ADA, however, the Court believes the information is relevant--particularly given that these examples are all in relative close proximity to her termination from Lincoln Prairie.

the Plaintiff asserts her termination was the result of discrimination due to her disability.

The Defendant moves for summary judgment on all counts of the Second Amended Complaint.

## II. LEGAL DISCUSSION

### A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the non-movant. See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. See Springer v. Durflinger, 518 F.3d 479,

484 (7th Cir. 2008).  Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor.  See id.

B. Termination claim

(1)

The ADA prohibits an employer from discriminating against an individual by discharging her from employment due to her disability.  42 U.S.C.  §  12112(a).  To  establish  a  prima  facie  ADA  claim  for discriminatory termination, a plaintiff must show that: "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability."  Dvorak v. Mostardi Platt Assoc., Inc.,289 F.3d 479, 483 (7th Cir. 2002).  In order to establish the third prong, the plaintiff must show that the disability was a "but for" cause of her termination, which can be shown through direct or circumstantial evidence.  See Hooper v. Proctor Health Care Inc., 804 F.3d 846, 853 (7th Cir. 2015).   Therefore, the employer must have knowledge of the employee's disability in order for

liability to attach under the ADA.  See Spurling v. C&M Fine Pack, Inc., 739 F.3d 1055, 1061 (7th Cir. 2014) (citing 29 C.F.R. app. § 1630.9).

The Plaintiff claims that her depression and anxiety disorder together with her Bipolar 1 condition made her a qualified individual with a disability.  Assuming that the Plaintiff was a qualified individual with a disability, the Court concludes that she did not suffer an adverse employment decision due to her disability.

The undisputed facts show that Plaintiff was aware that her attendance on November 1, 2012 was more critical than on the typical day. On that morning, the Plaintiff initially said she would be late to work.  The Plaintiff reported she had been up late doing homework.  The Plaintiff said she would be in "ASAP" via text message to Renae Hale at 7:20 a.m.  At 9:00 a.m., she reported she would be in at 11:00 a.m.  When Hale described the Plaintiff's attitude as "worrisome," the Plaintiff responded via text that her classes were "worrisome" and her education was now her priority.  The Plaintiff commented on Hale's "audacity" and claimed she worked harder than Hale does at times.  The Plaintiff told Hale not to

opine on her dedication and priorities and labeled her comment on those topics to be "asinine."  The Plaintiff also told Hale not to text her again that day and to speak to her face to face.  She then called in sick.

One of the reasons given for the Plaintiff's termination was insubordination and unprofessional conduct.  The Lincoln Prairie Employee Handbook Resource and Code of Conduct Policy was received by the Plaintiff and acknowledged.  It provided that insubordination is one type of conduct that could lead to corrective action, including "immediate employment termination."

There can be little question that Plaintiff's conduct on November 1, 2012 qualified as being insubordinate and unprofessional.  Both Renae Hale and Mark Littrell testified that Plaintiff did not mention she was bipolar when they all met after November 1, 2012, and she did not attribute her behavior to any mental health conditions.  Hale and Littrell both said they did not know she was bipolar.

The Plaintiff alleges that Pamela Campbell, M.D., a child psychiatrist who worked on contract at Lincoln Prairie, mentioned the Plaintiff's mental

24

health issues to Renae Hale.  Dr. Campbell testified she told Hale that she did not believe the ECT process was working and they discussed the Plaintiff's erratic behavior.  Dr. Campbell testified she did not tell anyone at Lincoln Prairie that Plaintiff had been diagnosed as bipolar because that was confidential information.  The Plaintiff contends that Karma Howley, a nurse who worked at Lincoln Prairie, testified it would have been obvious to any registered nurse that the Plaintiff was overwhelmed and it was affecting her depression.  However, Howley's testimony is based at least in part on her own conversations and interactions with the Plaintiff.

The Court cannot assume that Renae Hale or Mark Littrell would have made the same observations about the Plaintiff's depression.  The evidence suggests they were generally aware that the Plaintiff experienced increased stress due to the demands of work and school, which is why she wanted to move to another position at Lincoln Prairie–a request that the facility was accommodating.

Under the ADA, the employee has the "initial duty to inform the employer of a disability."  Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d

1130, 1134 (7th Cir. 1996).  In this case, the Plaintiff did not tell anyone she was going to be late because of a disability.  The Plaintiff also did not attribute her unprofessional and insubordinate behavior to any disability such as depression, stress or bipolar disorder.  Rather, the Plaintiff alleges her supervisors should have known why she sent the text messages on November 1, 2012.  However, the Plaintiff points to no authority tending to show that an employer must speculate as to why an employee engages in conduct that violates company policy.

There simply is no evidence that discriminatory intent based on disability was a factor in deciding to terminate the Plaintiff's employment. Even when the evidence is viewed in a light most favorable to her, the Plaintiff cannot show that her disability was the "but for" cause of her termination.  Accordingly, the Plaintiff cannot establish she was terminated because of a disability under the direct method of proof.

(2)

Under the indirect method of proof, a plaintiff must establish that (1) she is disabled pursuant to the ADA; (2) she was meeting her employer's

legitimate expectations; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated, non-disabled employees more favorably.  See Hooper, 804 F.3d at 853.  If a plaintiff meets her initial burden, then the employer must come forth with a legitimate, non-discriminatory reason for the employment decision.  See id.  The plaintiff would then have to show that the proffered reason is a pretext for a discriminatory reason.  See id.

The Plaintiff cannot show she was discriminated against because of her disability under the indirect method.  There is no evidence that a similarly situated, non-disabled individual engaged in conduct similar to that of the Plaintiff and was not terminated from Lincoln Prairie as a result of that conduct.  Because she has presented no such evidence, the Plaintiff did not meet her burden of production under the indirect method of proof.

For the foregoing reasons, the Defendants are entitled to summary judgment on the Plaintiff's ADA termination claim.

C. Reasonable accommodation claim

In order to assert a prima facie case, a plaintiff alleging reasonable

accommodation must show: "(1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability."  Kotwicka v. Rose Packing Co., 637 F.3d 744, 747-48 (7th Cir. 2011).

Assuming the Plaintiff can meet the first two elements, the record establishes that the Defendant attempted to reasonably accommodate the Plaintiff.   The Plaintiff admits that she complained about another employee's work performance, Lincoln Prairie investigated the matter and provided counseling to the Plaintiff and the employee.  The Plaintiff also acknowledges that Lincoln Prairie supported her pursuit of further education and even provided her with tuition reimbursement.

The Plaintiff admits that, when she complained in the late Summer/early Fall time frame of 2012 about being overworked and underpaid compared to other clinical nurse managers, she was given a 3% raise on October 5, 2012, and told to expect two more raises over the next six months.

Subsequently, the Plaintiff asked to step down from the nurse

manager position entirely because of her school demands, her life duties and the position was stressful.  Renae Hale responded that the facility would accommodate her request because they thought the Plaintiff was a good nurse and she was an asset to the facility.  The facility never told the Plaintiff they would not try to accommodate her request.

The Plaintiff purports to dispute the above assertion by saying that Lincoln Prairie approved a transfer to a floor nurse position, but never transferred her because she was terminated first.  In fact, the Plaintiff was terminated before she could be transferred.  This is because the request for transfer was made almost immediately prior to the Plaintiff's unprofessional and insubordinate conduct.  The Plaintiff testified she filled out a job bid on October 26, 2012.  The document was signed by Renae Hale, granting permission for the Plaintiff to apply.  The Plaintiff testified Hale stated on October 29, 2012, that she would support the Plaintiff in any possible way.  Accordingly, the Plaintiff testified that her supervisor was taking measures to accommodate her request prior to November 1, 2012.

The record establishes that Defendant had every intention of

accommodating the Plaintiff's request to change positions before circumstances changed on November 1, 2012. The Plaintiff cites no authority that her request must be accommodated as soon as it is communicated. On November 1, 2012, the Plaintiff's actions provided cause for Lincoln Prairie to terminate her employment before she could be transferred. Lincoln Prairie was entitled to act in accordance with its policies.

Because the Plaintiff cannot show that the Defendant failed to reasonably accommodate her disability, Lincoln Prairie is entitled to summary judgment.

## III. CONCLUSION

Upon viewing the factual allegations and construing all inferences in a light most favorable to the Plaintiff, the Court concludes that summary judgment in favor of the Defendants is warranted. The record establishes that Lincoln Prairie was attempting to accommodate the Plaintiff's request to transfer to another position until November 1, 2012, when she engaged in insubordinate and unprofessional conduct.

There is no evidence that Plaintiff's employment was terminated due to her depression, anxiety disorder or Bipolar condition.

The Defendant was entitled to terminate the Plaintiff in accordance with its policies.  The Defendant simply made a business decision and there is no evidence that discrimination due to disability was the reason for the decision.

Ergo, the Defendants' Motion for Summary Judgment [d/e 34] is ALLOWED.

The Clerk will enter Judgment in favor of the Defendants and against the Plaintiff.

Upon the entry of Judgment, the Clerk will terminate this case.

ENTER: February 17, 2016

FOR THE COURT:

   /s/ Richard Mills
Richard Mills
United States District Judge

31